IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AXEL JOHNSON and SHERRIE JOHNSON,<br><br>     Plaintiffs,<br><br>    v.<br><br>THE HANOVER INSURANCE COMPANY,<br><br>     Defendant. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br>No. 1:23-cv-1294-KMW-AMD<br><br>OPINION |

**Joseph Scheaffer, Esq.**
RAWLE & HENDERSON, LLP
1650 Arch Street, Suite 2200
Philadelphia, PA 19103

*Counsel for Plaintiffs Axel Johnson and Sherrie Johnson*

**Jonathan M. Zagha, Esq.**
FINAZZO COSSOLINI O'LEARY MEOLA & HAGER, LLC
67 East Park Place, Suite 901
Morristown, NJ 07960

*Counsel for Defendant The Hanover Insurance Company*

**WILLIAMS, District Judge:**

I. **INTRODUCTION**

  This case concerns a homeowner's insurance dispute between plaintiffs Axel and Sherrie Johnson ("Plaintiffs") and their insurer, The Hanover Insurance Company ("Hanover"). Plaintiffs allege that a 2022 hailstorm caused extensive damage to their roof, and further claim that their insurance policy obligates Hanover to cover the costs of a new roof. After Hanover only partially accepted and paid their claim, Plaintiffs initiated the instant suit seeking to obtain the full replacement costs of a new roof.

Presently before the Court is Hanover's Motion for Summary Judgment under Federal Rule of Civil Procedure 56, which Plaintiffs have opposed. For the reasons set forth below, Hanover's Motion is granted.

## II.   BACKGROUND

Plaintiffs allege that on May 20, 2022, a hailstorm caused damage to the roof of their home located at 3 Bradford Court in Medford, New Jersey. (ECF No. 28-1 ¶ 2.[1]) At the time, Plaintiffs were covered under a homeowners' insurance policy issued by Hanover, which provided coverage for direct physical losses to the property caused by hail (the "Policy"). (*Id.*[2]) Approximately two months after the storm, Plaintiffs retained a roofing contractor, USA Roof Masters ("Roof Masters"), to inspect their property. (*Id.* ¶ 3.) Roof Masters reported hail damage to various elements of the property, including the roof's shingles, and also recommended that the roof be completely replaced. (*Id.*[3]) It recommended that the roof be completely replaced and provided an estimated replacement cost ("RC") totaling $124,309.82. (*Id.*)

Plaintiffs subsequently notified Hanover of their alleged loss and requested coverage to replace the roof. (*Id.* ¶ 4.) Thereafter, Hanover began investigating Plaintiffs' claim, first retaining Hancock Claims Consultant ("Hancock") to inspect the property. (*Id.* ¶ 5.) Contrary to the findings of Plaintiffs' roofer, Hancock concluded that while certain soft-metal components attached to the house may have been damaged by hail (*e.g.*, downspout, awning), the asphalt-shingled roof itself did not exhibit any signs of hail damage. (ECF No. 28-17.[4]) The roof did, however, show signs of

---

[1] *See* Hanover's Statement of Material Facts (ECF No. 28-1.)

[2] The Court specifically refers to the Hanover homeowner's insurance policy bearing policy number HNY H967634, effective from March 30, 2022, through March 30, 2023 (ECF No. 28-16.)

[3] *See also* USA Roof Masters Inspection Report (ECF No. 28-6); USA Roof Masters Roof Replacement Estimate (ECF No. 28-2.)

[4] *See* Hancock Claims Consultants Direct Inspection Report (ECF No. 28-17.)

2

thermal blistering and cracking—damages attributable to normal wear and tear. (*Id.*) Given the contradictory findings, Hanover retained engineering firm Envista Forensics ("Envista") to conduct an additional inspection. (ECF No. 28-1 ¶ 5.) Envista similarly determined that certain soft-metal components of the home were damaged by hail, but that any damage to the roof was consistent with thermal blistering and cracking—not hail. (ECF No. 28-18.[5])

Based on the foregoing inspections, Hanover concluded that Plaintiffs' roof had not been damaged by hail. On August 25, 2022, Hanover issued a letter to Plaintiffs denying their claim insofar as it sought to replace the roof. (ECF No. 28-19.[6]) Hanover did, however, approve coverage for certain metal structures that were indisputably caused by hail, namely the fascia, box vent, downspout, and bay roofs. (*Id.*) Initially, Hanover did not issue any payment to Plaintiffs because it found that their damages, estimated at $2,407.86, fell below Plaintiffs' $5,000 deductible. (*Id.*) Later, Hanover discovered that this was error, and that it should have applied a $1,000 deductible (*Id.*) It subsequently alerted Plaintiffs of the error and issued payment in the amount of $1,407.86 (*i.e.*, $2,407.86 loss less the $1,000 deductible). (ECF No. 28-7.[7])

Plaintiffs disputed Hanover's findings and continued to maintain that the Policy entitled them to the full RC value of the roof. On September 1, 2022, Plaintiffs wrote a letter to Hanover invoking the Policy's appraisal provision, demanding "an appraisal to determine the amount of hail loss," noting their disagreement with "the amount of loss suffered at the covered property." (ECF No. 30 at 171.[8]) Hanover denied Plaintiffs' demand, explaining that the Policy's appraisal

---

[5] *See also* Envista Forensics Report of Findings (ECF No. 28-18.)
[6] *See also* Hanover Partial Denial Letter (ECF No. 28-19.)
[7] *See* March 15, 2023 Letter and Check (ECF No. 28-7.)
[8] *See* September 1, 2022 Letter of Axel and Sherri Johnson (ECF No. 30 at 171.)

procedures were reserved for disputes concerning "the actual value of agreed upon damages." (*Id.* at 173.[9])

On February 6, 2023, Plaintiffs commenced this suit by filing their two-count Complaint in the Superior Court of New Jersey, Law Division, Burlington County. (ECF No. 1-1 at 5–9.) Thereafter, Hanover timely removed Plaintiffs' Complaint to this Court under 28 U.S.C. § 1441, citing diversity of citizenship jurisdiction. (ECF No. 1.) After Hanover answered the Complaint, the Court appointed an arbitrator, who heard Plaintiffs' case on April 23, 2024. (ECF No. 23.) The arbitration award was received by the Court and filed under seal on April 29, 2024. Plaintiffs then demanded a trial *de novo*. (ECF No. 24.)

On August 30, 2024, Hanover filed the instant Motion for Summary Judgment, which Plaintiffs have opposed (ECF Nos. 28, 30, 32.) Hanover's Motion is thus ripe for disposition.

## III. LEGAL STANDARD

A court may grant summary judgment when the materials of record "show[ ] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law.").

---

[9] *See* September 2, 2022 Letter from Hanover (ECF No. 30 at 173.)

Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If satisfied, the burden then "shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* (internal quotation marks omitted) (emphasis in original). To survive a motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *See Anderson*, 477 U.S. at 256–57. "A non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements[.]'" *Trap Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

IV. **DISCUSSION**

Plaintiffs' Complaint has asserted two claims against Hanover under New Jersey law for breach of contract (Count I) and bad faith (Count II).[10] Hanover seeks summary judgment with respect to both counts. The Court addresses each of Plaintiffs' claims in turn.

---

[10] The parties do not dispute that New Jersey law applies to Plaintiffs' claims.

### A. **Breach of Contract**

Plaintiffs claim that Hanover has breached the terms of their Policy by failing to fully compensate them for the hail damage to their roof. They accordingly demand $124,309.82 to replace it, as estimated by their roofer.

To prevail on a claim for breach of contract under New Jersey law, a plaintiff must demonstrate (1) the existence of a contract between the parties; (2) that the defendant breached the contract; (3) damages flowing therefrom; and (4) that plaintiff performed his own obligations under the contract. *See Arena v. RiverSource Life Ins. Co.*, 356 F. Supp. 3d 413, 416 (D.N.J. 2018) (citing *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007)).

Here, Hanover's Motion concerns only the third element—damages. Of course, the parties dispute whether Plaintiffs' roof sustained hail damage at all. But even assuming that it did, Hanover submits that summary judgment is nonetheless appropriate because Plaintiffs have failed to produce evidence establishing the amount of the only damages to which they would be entitled—specifically, the actual cash value ("ACV") of the roof (*i.e.*, replacement cost less depreciation). Its argument proceeds in two parts.

First, Hanover notes that although Plaintiffs seek recovery on a RC basis, the Policy entitles them to RC only after repairs or replacement are completed. Because Plaintiffs have not repaired or replaced the roof to date, their recovery is contractually limited to the roof's ACV.

Second, Hanover argues that Plaintiffs have not presented any evidence of the roof's ACV. Instead, they rely solely on an RC estimate from their roofer. Because the Policy limits recovery to ACV unless and until repairs are made, Plaintiffs must establish the ACV to satisfy their burden of proof on damages. Their failure to do so, Hanover argues, is fatal to their claim.

### i. *Measure of Damages*

As an initial matter, the Court confirms that the plain language of the Policy indeed limits Plaintiffs to the ACV of their roof, as opposed to its RC. As with any contract, the interpretation of an insurance policy is generally a question of law for courts to decide. *See Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 674 (3d Cir. 2016). While in some instances the interpretation of an insurance policy may pivot "on underlying, disputed facts," that is not the case here. *Dunkerly v. Encompass Ins. Co.*, 296 F. Supp. 3d 681, 685 (D.N.J. 2017) (internal quotation marks omitted). The question presented to the Court assumes the existence of compensable hail damage and asks whether the Policy restricts Plaintiffs to the ACV of their roof under the circumstances.

The relevant portion of the Policy reads as follows:

2. Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

   a. If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, without deduction for depreciation, but not more than the last of the following amounts:

      (1) The limit of liability under this policy that applies to the building;

      (2) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

      (3) The necessary amount actually spent to repair or replace the damaged building.

   \* \* \* \*

   d. **We will pay no more than the actual cash value of the damage until repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in 2.a. and b. above.**

      However, if the cost to repair or replace the damage is both

         (1) Less than 5% of the amount of insurance in this policy on the building; and

         (2) Less than $2,500;

      we will settle the loss as noted in 2.a. and b. above whether or not actual repair or replacement is complete.

(ECF No. 28-16 at 20–21) (emphasis added.)

The Third Circuit has succinctly synthesized the principles of interpreting insurance policies like the one here:

> Under New Jersey law, an insurance policy is simply a contract and its provisions should, of course, be construed as in any other contract. As is the case with other types of contracts, an insurance policy is to be governed by its own terms without recourse to other documents unless its own language so requires. In the absence of any ambiguity, the terms of an insurance policy should be given their plain, ordinary meaning.
>
> Ambiguity exists where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage. New Jersey caselaw does not require that we credit every conceivable deconstruction of contractual language, but rather instructs that the doctrine of ambiguity should be invoked only to resolve genuine ambiguities, not artificial ambiguities created by semantical ingenuity. Determining whether genuine ambiguity is present in an insurance policy requires interpreting the policy as a whole, by giving a reasonable meaning to its form and cast.

*Royal Ins. Co. of Am. v. KSI Trading Corp.*, 563 F.3d 68, 73–74 (3d Cir. 2009) (citations and quotation marks omitted); *see also Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264–65 (N.J. 2001).

Courts in this District have consistently interpreted substantively identical policy language and found it to be clear, unambiguous, and enforceable. *See Giacobbe v. QBE Specialty Ins. Co.*, No. 1:14-CV-6387, 2018 WL 2113266, at *4 (D.N.J. May 8, 2018); *Dunkerly v. Encompass Ins. Co.*, 296 F. Supp. 3d 681, 684 (D.N.J. 2017). The Policy at issue here is no different: its language is "clear and non-technical"; is "not encumbered by complexities"; and does "not contradict the understanding of an average purchaser." *Dunkerly*, 296 F. Supp. 3d at 687. By its plain terms, the Policy obligates Hanover to pay for covered property losses on a RC-basis only *after* the property has been repaired or replaced. Until that condition is satisfied, recovery is limited to the roof's ACV. Plaintiffs have not repaired or replaced the roof. Thus, even assuming that Plaintiffs' roof

8

suffered the hail damage they claim, they can only be entitled, at most, to the roof's ACV—not its RC.

Plaintiffs do not contest this interpretation of the Policy or otherwise offer an alternative reading. Nor do they dispute that they have not conducted any repairs. Nevertheless, they submit that Hanover has breached the Policy in such a way as to "frustrate the purpose of the agreement." (ECF No. 30 at 8.[11]) To this end, they argue that they should, as a matter of fairness, be excused from repairing or replacing the roof as a condition precedent and be permitted to recover from Hanover the RC value of the roof.

Presumably, Plaintiffs intend to invoke the equitable doctrine of impossibility of performance, which works to excuse a plaintiff from performing a condition precedent of a contract where the defendant, by its own conduct, rendered the plaintiff's compliance therewith impossible.[12] *See Liberty Mut. Ins. Co. v. President Container, Inc.*, 687 A.2d 760, 766 (N.J. Super. Ct. App. Div. 1997). This doctrine has been applied in the insurance context, specifically to policies requiring actual repair or replacement of an insured structure before RC benefits are payable. *See Ward v. Merrimack Mut. Fire Ins. Co.*, 753 A.2d 1214, 1218 (N.J. Super. Ct. App. Div. 2000). Where an insurer's denial of coverage is said to be the cause of non-performance, "the focus is whether in fact [the insurer's] refusal to tender even the actual cash value made it impossible for plaintiff to satisfy the precondition of replacing the structure." *Id.* at 1219. To survive summary judgment, the plaintiff must point to evidence showing actual impossibility, such as financial hardship or an inability to secure financing. *See id.*

---

[11] *See* Plaintiffs' Brief in Opposition to Hanover's Motion for Summary Judgment (ECF No. 30.)

[12] Specifically, Plaintiffs contend that Hanover should be "estopped" from relying on the "actual cash value limitation" of the Policy. *See id.* at 8. Despite Plaintiffs' use of the term "estoppel," the substance of their argument is more appropriately analyzed under the doctrine of impossibility of performance. *See Ward v. Merrimack Mut. Fire Ins. Co.*, Plaintiffs 753 A.2d 1214, 1218 (N.J. Super. Ct. App. Div. 2000).

Plaintiffs do not argue—nor does the record show—that Hanover's failure to pay even the ACV of the roof prevented them from making repairs. Indeed, Plaintiffs have presented no evidence of the roof's ACV or of any financial hardship that would have made repairs impossible without those funds. In fact, it is unclear whether Plaintiffs have ever sought anything less than RC coverage. But rather than demonstrate true impossibility, Plaintiffs posit that Hanover's refusal to pay the RC upfront—before repairs were made—somehow breached the Policy and "frustrated [their] ability to make repairs." (ECF No. 30 at 9.) In other words, they claim they could not fulfill the Policy's conditions because they did not receive a benefit that only becomes available after fulfilling those very conditions. This argument is as circular as it is untenable. As a matter of logic, a party cannot be excused from meeting a condition precedent simply because they have not received the benefit that depends on satisfying it. The doctrine of impossibility clearly does not apply in this case.

### ii. *Proof of Damages*

Having determined that the Policy limits Plaintiffs' recovery to the ACV of the roof, the Court now must determine whether the absence of evidence showing ACV is fatal to Plaintiffs' breach of contract claim—it is.

"It is well settled in New Jersey that the plaintiff bears the burden of proving beyond uncertainty that he has in fact been damaged, and once that has been established the plaintiff bears the burden of proving the amount of such damages with a reasonable degree of certainty." *Lightning Lube v. Witco Corp.*, 802 F. Supp. 1180, 1194 (D.N.J. 1992). Where insurance policies like the one here limit a plaintiff's recovery to the ACV of a home, courts in this District have repeatedly held that plaintiffs cannot proceed to trial on breach of contract claims armed only with

evidence of the RC-based value of their alleged loss. *See Giacobbe*, 2018 WL 2113266, at *4; *Dunkerly*, 296 F. Supp. 3d at 684.

Here, it is undisputed that Plaintiffs have not submitted any evidence establishing the ACV of their roof. The only evidence of damages offered by Plaintiffs is the RC estimate prepared by their roofer. Although the estimate includes columns for calculating ACV, including depreciation, the roof neither identified any depreciation nor assigned an ACV to the claimed damage. While evidence of ACV is always essential to sustaining this type of breach of contract claim, its absence is particularly significant here given the condition of Plaintiffs' roof prior to the alleged hailstorm. Discovery has revealed that, just three months before the purported loss, Plaintiffs received a pre-loss inspection report documenting the roof's advanced age and deterioration. Among other findings, the report advised that the shingles were "near the end of their useful life," were "likely to need replacement in the near future," and that "[s]ufficient funds should be budgeted for replacement." (ECF No. 28-21 at 3.[13])

"Having placed all their eggs in the [RC] basket," Plaintiffs' failure to adduce any evidence of their roof's ACV renders summary judgment "not only appropriate but required." *Giacobbe v. QBE Specialty Ins. Co.*, No. 1:14-CV-6387, 2018 WL 4110924, at *2 (D.N.J. Aug. 28, 2018) (denying plaintiff's motion for reconsideration following summary judgment). Accordingly, Hanover's Motion is granted.

### B. **Bad Faith**

Plaintiffs also assert a claim for bad faith under New Jersey common law, which they premise on two allegations: (1) that Hanover improperly rejected their demand for appraisal; and (2) that Hanover initially applied an incorrect $5,000 deductible before correcting it and issuing a

---

[13] *See* Inspection Report of DwellSafe Inspections and Engineering dated February 7, 2022. (ECF No. 28-21.)

11

payment based on the correct $1,000 deductible. On this record, no reasonable jury could find that Hanover acted in bad faith under either theory.

New Jersey law recognizes that "every insurance contract contains an implied covenant of good faith and fair dealing." *Wood v. New Jersey Mfrs. Ins. Co.*, 21 A.3d 1131, 1140 (N.J. 2011) (internal quotation marks omitted). Correspondingly, "an insurance company owes a duty of good faith to its insured in processing a first-party claim." *Pickett v. Lloyd's*, 621 A.2d 445, 450 (N.J. 1993). An insurer's breach of that duty is actionable at common law on claims for bad faith:

> Bad faith is an intentional tort. To establish bad faith, a plaintiff must show the lack of a reasonable basis for denying the claim or unreasonably delaying its processing, and the insurer's knowledge or reckless disregard that it was acting unreasonably. This claim cannot be sustained by evidence of negligence, mistake or delay in payment without some showing of the insurer's wrongful intent.

*Wacker-Ciocco v. Gov't Emps. Ins. Co.*, 110 A.3d 962, 968 (N.J. Super. Ct. App. Div. 2015) (citations omitted).

Plaintiffs first argue that Hanover acted in bad faith by refusing to submit their dispute over the roof damage to appraisal. This argument misapprehends the scope of appraisal under both their Policy and New Jersey law. By its own terms, the Policy's appraisal procedures are triggered only when the parties "fail to agree on the *amount* of loss." (ECF No. 28-16 at 21) (emphasis added.) Repeatedly, New Jersey courts have held that appraisal clauses apply to questions concerning the valuation or amount of loss, not issues of coverage or liability. *See, e.g.*, *Hartford Fire Ins. Co. v. Computer Data Source, Inc.*, No. 09-1400, 2010 WL 11570230, at *1 (D.N.J. Jan. 14, 2010) ("Coverage issues concern whether the insurance company is liable for the damage at issue, while appraisal issues concern the extent of the damage for which the insurance company is liable."). At the time Plaintiffs demanded an appraisal, Hanover had asserted that it bore no liability for hail damage to the roof because the roof sustained no such damage. This was a coverage determination—not a valuation dispute—and therefore fell outside the scope of the Policy's

12

appraisal clause. At the very least, Hanover's denial of the appraisal, and even its rejection of Plaintiffs' underlying claim for coverage, was "fairly debatable," precluding any finding of bad faith. *See Pickett*, 621 A.2d at 454.

Plaintiffs' second basis for bad faith is Hanover's initial misapplication of the $5,000 deductible, which was later corrected after the insurer determined that the correct deductible in effect on the date of loss was $1,000. Once the error was identified, Hanover promptly issued payment in the amount of $1,407.86. Hanover has since explained that it initially applied a $5,000 deductible to Plaintiffs' claim due to a mistake stemming from a policy endorsement that took effect shortly after the alleged hail loss. While the policy originally carried a $1,000 deductible, a May 25, 2022 endorsement increased it to $5,000—mere days before the alleged hail event. Plaintiffs did not report the loss until July 19, 2022—months after the endorsement had taken effect—which led the adjuster to mistakenly apply the higher deductible when evaluating the claim. Notably, Hanover unilaterally detected and corrected the error months after its August 2022 coverage letter, and had never been alerted to the same by Plaintiffs.

Plaintiffs offer no evidence suggesting that the initial error was anything more than a clerical mistake. Nor do they allege that they suffered any harm as a result of this temporary delay. Absent some evidence of wrongful intent or reckless disregard, Plaintiffs' bad faith claim must fail. *See Wacker-Ciocco*, 110 A.3d at 968.

V.  **CONCLUSION**

    For all of the reasons set forth above, Hanover's Motion for Summary Judgment is granted.

Dated: May 29, 2025

                                               KAREN M. WILLIAMS
                                               U.S. DISTRICT COURT JUDGE